Ella Mae JETER, Plaintiff,

v.

Robert H. FINCH, Secretary of Health, Education and Welfare, Defendant.

No. 1950.

United States District Court,
E. D. Kentucky,
Lexington Division.

March 31, 1970.

George R. Smith, Lexington, Ky., for plaintiff.

George I. Cline, U. S. Atty., J. T. Frankenberger, Asst. U. S. Atty., Lexington, Ky., for defendant.

## MEMORANDUM

SWINFORD, District Judge.

The plaintiff, Ella Mae Jeter, brings this action under the provisions of 42 U.S.C. § 405(g). In September of 1965, she filed a claim for disability benefits which was denied. She claimed an inability to work beginning February 1965. The disabling condition was listed as "Low blood pressure & Leg trouble". (Tr–78) On January 16, 1967, she reapplied and the claim was again denied. The disability was given as "operation on hip—difficulty in walking" and she stated she became unable to work because of the disability in the "Fall 1961 or earlier". (Tr–85)

At her request a hearing was granted and on February 28, 1968, the plaintiff appeared, with her attorney, and testified. Mr. Ronald G. Hampton, a vocational expert, was also present at the hearing and testified. Subsequently, on May 17, 1968, the hearing examiner made his decision. He found that she was entitled to a period of disability (or freeze of her earnings account record) during the period January 1, 1956, through December 31, 1962; that she was not entitled to disability insurance benefits; that she was not entitled to either disability insurance benefits or to a period of disability (under the Act) prior to the effectiveness of the Amendments of 1965, for any time through May 17, 1968; and that the plaintiff's application of September 3, 1965, be reopened for revision, etc. (Tr-20)

Miss Jeter then requested a review of the hearing examiner's decision which was granted. On November 15, 1968, the Appeals Council "(A)fter careful consideration of the entire record * * * based on a preponderance of the credible evidence, (made) the following specific findings:

"1. The claimant last met the special earnings requirements of the Act on December 31, 1960.

"2. The claimant had a severe impairment which precluded work activity from January 1, 1956, to December 31, 1962.

"3. The claimant's period of disability ended more than 12 months before the filing date of her application of September 3, 1965, because she demonstrated her ability to engage in work activity between 1963 and 1965 which constituted substantial gainful activity.

"4. The claimant was not under a 'disability' as defined in the Act, either prior to or after the Amendments of 1965.

"It is the decision of the Appeals Council that the claimant, based on her applications of September 3, 1965 and January 16, 1967, is not entitled to a period of disability or to disability insurance benefits under the provisions of sections 216(i) and 223, respectively, of the Social Security Act, in effect prior to the Social Security Amendments of 1965 or as amended thereby. The hearing examiner's decision is reversed." (Tr-6-7)

The decision of the Appeals Council thus became the final decision of the Secretary and this action was timely filed on January 7, 1969.

The defendant filed an answer on April 28, 1969, together with a certified copy of the transcript of the entire record of proceedings relative to the plaintiff's claim. On June 18, 1969, the defendant filed a motion for summary judgment, with a brief in support of the motion. On August 18, 1969, the plaintiff filed her motion for summary judgment with supporting brief. The record is now before the court on the respective motions.

The plaintiff is 62 years of age and has done secretarial work since she was eighteen years of age. This work has been largely in the legal field and it is undisputed that she is highly skilled, competent and capable of accepting responsibility in the discharge of her duties. For approximately ten years, February 1946 until November 1955, Miss Jeter worked in the office of Mr. Frank L. McCarthy, an attorney in Lexington, Kentucky. Mr. McCarthy was also the Chairman of the Railroad Commission and she acted as a hearing reporter for the Commission during this period. The only reason given by the plaintiff for not continuing her work with Mr. McCarthy was "Well, it was a personal matter". (Tr-51) At that time she was 48½ years old. The hearing examiner questioned her further along this line as follows:

"Q  You were not able to go back there because of a personal matter, say in January of 1956?

"A  That's right.

"Q  And how about February of 1956?

"A  Well, it would be the same thing. I wouldn't go back to Mr. McCarthy." (Tr–51–52)

From November of 1955 until 1960 she was not employed on a salary. (Tr–147)  She stated she tried to find a job but "most people turned me down on account of my age". (Tr–51)

In August of 1956 she had a broken ankle; in May of 1957 she had a fractured shoulder and in December of 1958 she had a sprained ankle. (Exhibit 21, Tr–118)  Also in April of 1958 she was treated in the Good Samaritan Hospital (Lexington), as a patient of Dr. Thornton Scott, for "acute and (chronic) alcoholism, alcohol withdrawal syndrome" and "peripheral polyneuritis" (nerve inflammation). (Exhibit 23, Tr–120)

It is on the basis of this medical evidence that the plaintiff was found to have had "a severe impairment which precluded work activity from January 1, 1956, to December 31, 1962." (Tr–6)

She was employed full time from April 1963 until January 1965. (Tr–147)  At the hearing in February of 1968, the vocational witness questioned Miss Jeter as follows:

"In reference to your work, Miss Jeter, since 19 and 60, outside of the one temporary at the Hartford Insurance Company and particularly with the two positions as one was for a full year in Nicholasville, what was the particular reasons that you left these positions?" (Tr–66)

The plaintiff then explained the difficulty she had with another secretary in the office in one instance and in the other that a former employee returned to her job following an illness. (Tr–67–68)

The hearing examiner summed up the explanation by saying

"Well, then just for my own clarification in both of these cases, the reason that you left was because in the one case, a returning employee, and in the other case, as all secretaries when you have more than one secretary, they all seem to get at each other was rather for this rather than a physical problem."

"CLAIMANT: Yes, that's right.  I mean Mr. Garrison he liked my work and I was well liked down there.

"A  But it wasn't because of a physical problem, not being able to work, to be able to do the work?

"CLAIMANT: It wasn't that at all." (Tr–68)

Her medical problems from 1964 until June of 1966 are set forth in a letter of January 24, 1967, from Dr. Kenneth L. Sears, Lexington, Kentucky, a specialist in internal medicine, to the Social Security Administration (Exhibit 31, Tr–136–137):

"I first saw this patient in January, 1964, when she had been admitted to the hospital by Dr. Allen Grimes.  She was obese and a known ethanolic problem.  She had developed pain both tender indurated erythematous lower legs bilaterally.

"Our work up indicated that she had typical cirrhosis of the liver, phlebitis of both lower legs and secondary cellulitis, with secondary swelling of the legs for the past 3 weeks probably secondary to the cirrhosis.

"She was treated typically for phlebitis and cirrhosis while in the hospital.  Subsequently she was followed in the office for which she received diuretics and vitamins over a period of many months.

"She continued to show ascites of the abdomen for many months in spite of therapy but improvement was progressive.

"In May, 1965, she was again readmitted to the hospital because of ascites.  Her response was slower and she was discharged after approximately 8 hospital days.

"In October, 1965, she was readmitted to the hospital because of weakness and marked reaction to alcohol.  She had developed additional ascites and had been using alcohol freely.  She

had a severe secondary cellulitis and dermatitis of the groins which was felt to be infectious in nature. She responded fairly well and was discharged after approximately 8 hospital days.

"In June, 1966, she began to complain of tenderness in the right hip and was walking with a marked limp. She was advised to consult Dr. Murphy, an orthopedist of this city. Dr. Murphy reported that she had aseptic necrosis of both hips. He reported that he planned to do a cup type of orthoplastic surgery on the right hip. This was performed in August, 1966. Subsequently to that time she has been followed by Dr. Murphy. I believe at the present time she is now under physiotherapy.

"I am sure that more exact details concerning this problem can be obtained from Dr. Murphy." (Tr–136–137)

Dr. Owen B. Murphy, an orthopedic surgeon of Lexington, Kentucky performed surgery on her right hip in August of 1966 and she was dismissed from the hospital in September 1966. (Exhibit 27, Tr–124) A follow up letter from Dr. Sears of March 26, 1968, to the Social Security Administration, is as follows:

"Your attention is directed to the letter written January 24, 1967. Since the operation in August, 1966, the patient has been followed by Dr. Murphy. According to my information a cup type of orthoplastic surgery was performed on the right hip in August, 1966. Post-operatively she was followed with physiotherapy by Dr. Murphy. She improved progressively.

"In June 14, 1967, she was seen in my office. Her weight was 119 pounds which was a loss of 40 pounds. Her hemoglobin was 12.3 grams, blood pressure 110/70, pulse 70, respirations 16. She was then taking Darvon compound 65. She was ambulatory and had improved remarkably. Her ap-

pearance had improved, her liver status had improved.

"She was continuing to carry out a program of physiotherapy, apparently at home. It was her intention to try to return to light work.

"On March 20, 1968, I saw this patient in the office. Her weight was 131½ pounds. Blood pressure 110/70, height 5′4″. Her improvement was remarkable. She was walking fairly well, she complained of limited exercise tolerance and fatigue. She was advised to lose 20 pounds and continue on her program of active physiotherapy.

"Condition: Improved.

"Prognosis: Markedly improved." (Tr–181)

On February 23, 1968, Dr. Murphy made the following report:

"This letter concerns Miss Ella Mae Jeter who was examined in my office on 2–20–68. She is considerably improved. She walks without assistance stating she has increased pain in her left hip but the mobility, motion and discomfort in the right hip is not too great.

"Under these circumstances she was advised to continue on the same treatment, try to increase her activity, particularly muscle useability, and as she progresses should return for further observation.

"She wishes a statement with regard to my opinion and estimate as to the onset of her bilateral hip disease and whether or not I thought it antedated December, 1960.

"I think without question that the amount of destruction and loss of joint surface and degeneration of the head of both femurs, particularly the right, that this disease would definitely antedate 1960. I informed Miss Jeter, however, that this would have to be inculcated with other factors.

"If you need any further information on this lady I will be happy to hear from you." (Tr–146)

In the plaintiff's motion for summary judgment and in the memorandum in

support of the motion, the plaintiff's attorney complains that it was brought to light for the first time in the defendant's brief that the plaintiff was an alcoholic. "This charge is bitterly denied and is most unjust in every respect." He complains of a letter from Dr. Sears (Exhibit 31) and states that "(N)one of the other doctors said one word regarding this plaintiff being an alcoholic. * * * the evidence was kept a secret and never one word regarding alcoholism was given to this attorney for Miss Jeter nor was it mentioned in Examiner Judge King's opinion where we might have had an opportunity to respond. Instead, the letter sent was written in long, medical terms. Even the brochure was given to plaintiff who could not understand to have her attorney see it." (Pages 1, 4, 6–Plaintiff's Memorandum, filed August 18, 1969) He also states that "a record of the case was a brochure which was not furnished plaintiff until June 18, 1969, and we never heard of it until August 10, 1969, while in plaintiff's home where we were preparing data for this argument." (Page 7–Plaintiff's Memorandum)

The record discloses that at the hearing on February 28, 1968, the hearing examiner explained in great detail the purpose of the hearing and the procedure to be followed. (Tr–27–29)

Mr. John W. King, the hearing examiner stated:

"My first knowledge of this case came after you filed your request for a hearing. At that time the Bureau of Disability Insurance, the Social Security Administration Office in Baltimore, Maryland, sent me the file in your case. That file contains the various documents which have been gathered up to the present time and include both the initial determination that was made and the reconsideration determination. I went through the file and marked those papers which I thought were material and relevant; that is the papers that are important in connection with your case. A list of the papers was made and Mr. Smith, I understand that prior to the opening of the hearing this morning, you had the opportunity to see the list and to examine the papers. May I ask do you have any objection to the admission of any of these documents into the record?

"ATTORNEY (Smith): Do you have any objection, you said something about it just talk to me.

"CLAIMANT: Talk to you?

"ATTORNEY (Smith): Just tell me what you were referring to.

"CLAIMANT: Well, I'd like a different statement from Dr. Sears. I'd like a different statement from Dr. Sears— I don't think Dr. Sears' statement—

"ATTORNEY (Smith): Dr. Sears.

"CLAIMANT: Dr. Sears.

"ATTORNEY (Smith): I don't have him here.

"CLAIMANT: Well, he's the one that examined me.

"ATTORNEY (Smith): You've got one in from him.

"CLAIMANT: Well, I got one in from him but I rather he have another statement.

"ATTORNEY (Smith): My client would like to get an amended statement from Dr. Sears. His statement is in the original record she tells me but that it is not sufficient—that it can be enlarged on to her benefit and she wants a right to file a statement from Dr. Sisk.

"CLAIMANT: Sears.

"ATTORNEY (Smith): Sears, in addition to the one that's there and put it in the record.

"HEARING EXAMINER: All right. Then Mr. Smith and Miss Jeter, I understand that you are not objecting to the use of exhibit, proposed Exhibit Number 31 in the record as evidence but only that at the hearing you be given an opportunity to testify further with respect to it and also ask for the record—ask that it be kept open to give you an opportunity to get a more recent report and perhaps a more full report from Dr. Sears. Is that right?

"CLAIMANT: That's right.

"HEARING EXAMINER: All right, thank you. There being no objection then, the documents set out on the list of exhibits will be received in evidence as Exhibits 1 through 35 and also received without objection as your offering are the following proposed exhibits: * * *." listing exhibits 36 through 41. (Tr–29–30)

It is thus clearly shown that the plaintiff and her attorney agreed to the admission of Exhibit 23, which was a copy of a Good Samaritan Hospital record, signed by Dr. Thornton Scott on April 4, 1958, which gave a final diagnosis of "acute and chronic alcoholism, alcohol withdrawal syndrome", etc. The plaintiff also requested that she be given an opportunity to get a more recent report from Dr. Sears, which was granted. (Exhibit 46, Tr–181) Exhibit 31, to which she was not objecting, stated that "(I)n October, 1965, she was readmitted to the hospital because of weakness and marked reaction to alcohol. She had developed additional ascites and had been using alcohol freely."

A copy of the hearing examiner's decision and a notice of the right to request a review of it by the Appeals Council was mailed to the claimant and her attorney, Mr. George R. Smith, on May 17, 1968. (Tr–11) The diagnosis by Dr. Scott of acute and chronic alcoholism was referred to by the examiner. (Tr–16, page 5 of the decision) The plaintiff evidently received the notice and copy of the decision, because on June 18, 1968, she filed a request for a review stating "I believe I have been disabled since 1956 and am disabled at present." (Tr–10)

The "brochure" to which the attorney refers is apparently the transcript of the proceedings which the defendant filed with his answer on April 28, 1969. Paragraph (6) of the answer is as follows:

"In accordance with the provisions of section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), defendant files herein as part of this answer a certified copy of the transcript of the record including the evidence upon which the findings and decisions complained of are based."

The certificate of Mr. J. T. Frankenberger, Assistant United States Attorney, recites that a copy of the answer was served upon the plaintiff by mailing it to Hon. George R. Smith, 603 Security Trust Building, Lexington, Kentucky on April 28, 1969. Since the transcript was a part of the answer, if it was not received, the attorney should have advised the United States Attorney. However, on May 12, 1969, the attorney for the plaintiff filed a "Reply" denying "any and all affirmative allegations contained in the Answer filed herein". The plaintiff was an experienced legal secretary and the attorney can hardly complain that his client did "not understand" to have her attorney see any papers in connection with her case.

While this evidence with reference to the plaintiff's problems with alcohol is a part of the record, there is nothing to indicate that it affected in any way the final decision of the Secretary. However, since the plaintiff's attorney has complained that this evidence is in the record without his knowledge, the court is constrained to point out the facts as reflected by the record.

█ It is not the province of this court to consider the evidence de novo and judicial review is limited to inquiry as to whether there is substantial evidence in the record as a whole to support the findings of the Secretary. Lewis v. Gardner, 6 Cir., 396 F.2d 436; Hall v. Gardner, 6 Cir., 403 F.2d 32; Rose v. Cohen, 6 Cir., 406 F.2d 753.

█ The Appeals Council in its discussion of the plaintiff's case cogently stated the facts on which it made its findings. The court must hold that the following quoted from the Appeals Council's decision is based on substantial evidence:

"The evidence summarized by the hearing examiner reveals that the claimant had a severe impairment which prevented her from being able to work from January 1, 1956, to December 31,

1962. However, the claimant did not have a disabling impairment from 1963 through 1965 because she demonstrated her ability to work and engage in substantial gainful activity during that period, as described in the hearing examiner's decision. The Appeals Council agrees with the hearing examiner's observation that this work constituted substantial gainful activity. Since the claimant was not disabled from 1963 through 1965, she is not entitled to a period of disability prior thereto because the period of her · disabling impairment ended more than 12 months before the filing date of her application dated September 3, 1965. Furthermore, any period of disability commencing subsequent to 1965 cannot be established because the claimant was no longer insured for disability purposes subsequent to December 31, 1960, the last date on which the special earnings requirements of the Act were met." (Tr–6)

The burden is on the applicant to establish that she is entitled to the benefits of the Act. Whitt v. Gardner, 6 Cir., 389 F.2d 906; Nelson v. Gardner, 6 Cir., 386 F.2d 92; Justice v. Gardner, 6 Cir., 360 F.2d 998. This is a remedial statute and should be liberally construed but the burden of establishing a claim under it rests upon the one who asserts it and no rule of liberality will take the place of required proof. The award of benefits cannot rest upon imagination, speculation, conjecture or sympathy—only credible proof in some form will suffice. Certain standards and tests for the administration of this Act are required to be established to differentiate it from a form of direct relief. It thus becomes the clear duty of those charged with administering the program to adhere to these standards and apply them fearlessly lest the program become the subject of abuse and ridicule. Bailey v. Gardner, D.C., 269 F.Supp. 100.

Miss Jeter has simply failed to establish that she was under a disability beginning on or prior to December 31, 1960, and that such period of disability continued to September 3, 1964, 12 months prior to the application filed on September 3, 1965.

The motion of the defendant for summary judgment should be sustained and an order to that effect is this day entered.